Karmen Schmid #13583
Spencer D. Brown #17516
STRONG & HANNI
102 South 200 East, #800
Salt Lake City, UT 84111
Telephone: 801-532-7080
Facsimile: 801-596-1508
kschmid@strongandhanni.com
sdbrown@strongandhanni.com
*Attorneys for Defendant*
*Red Rock 4-Wheelers, Inc.*

---

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LAURA NEUMANN<br><br>　　　　Plaintiff,<br><br>vs.<br><br>RED ROCK 4-WHEELERS, INC., a Utah Corporation; DOES 1 through 100; and ROES 1 through 100, inclusive,<br><br>　　　　Defendants. | **RED ROCK 4- WHEELERS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00516 DAK-CMR<br><br>District Judge Dale A. Kimball<br>Magistrate Judge Cecilia M. Romero |

## <u>INTRODUCTION AND RELIEF REQUESTED</u>

In April 2019, Laura Neumann travelled from Nevada to Moab, Utah to participate in an offroad jeeping event called the "Easter Jeep Safari" organized by Red Rock 4-Wheelers, Inc. (Red Rock). Red Rock is a social club whose members are jeeping enthusiasts. Red Rock's mission includes working to keep public lands accessible to jeeping. Its members help to clean up and mark trails in the Moab area. Red Rock's officers and directors are unpaid volunteers.

Red Rock has organized the annual Easter Jeep Safari (Safari) event since 1983. The week-long event draws thousands of participants from across the country every year and consists of dozens of trail rides departing from Moab, Utah. The trails have varying degrees of difficulty: some trails are essentially flat, while others require the driver to navigate difficult, naturally occurring, obstacles. Participates drive their own vehicles on the trails. Red Rock organizes the rides by signing up participants and providing trail guides for the rides. Four or five trial guides are assigned per trail ride, with a guide leading at the front of the group, two guides in the middle of the group, and a guide placed at the rear. Trail guides drive their own vehicles and are unpaid volunteers.

On the morning of April 14, 2019, Ms. Neumann and her now husband Rick Weight embarked on the Golden Spike Trail as part of a group of approximately 30 other vehicles. The Golden Spike Trail is rated a difficulty of 7 out of 10. For background on the Safari and this specific trail, a YouTube video of Safari participants driving the Golden Spike Trail in 2019, can be found at https://www.youtube.com/watch?v=NUJguHIqXyQ.

Part of the enjoyment of this event is the camaraderie that occurs between the participants. Participants frequently exit their vehicles to observe other drivers navigate a challenging obstacle. Eight hours into the trail ride, Ms. Neumann and Mr. Weight were outside of their vehicle, watching another driver attempt to drive over a large boulder. The driver lost control of his vehicle and veered directly toward where Ms. Neumann was standing. Ms. Neumann was hit and suffered severe injuries.

Ms. Neumann's claims are barred by the doctrine of primary assumption of risk. Off-road jeeping involves a degree of danger, and the skill and experience of the driver play a significant

role in the enjoyment of the sport.  The risk of another driver making a mistake and causing injury to other participants, is an inherent risk of this activity.  Ms. Neumann assumed this risk by participating in this event, and by exiting her vehicle to watch the other driver attempting to maneuver a difficult obstacle.  There is no evidence that anyone associated with Red Rock, directed Ms. Neumann to stand in the location where she was standing.  There is no evidence that, on the day in question, Red Rock undertook to control where the participants could stand when watching other drivers maneuver obstacles.  Ms. Neumann's claim for ordinary negligence is therefore barred.

Ms. Neumann's ordinary negligence claims are also barred because she signed a pre-injury waiver as to those claims.  Finally, Ms. Neumann has insufficient evidence to support a finding that Red Rock was grossly negligent, and for that reason her claim for gross negligence fails as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### *The Easter Jeep Safari*

1. Red Rock 4 Wheelers, Inc. (Red Rock) is a Utah corporation, headquartered in Moab, Utah. Red Rock is a social club, whose members are off-road driving enthusiasts.  *See* Ex. 1, Declaration of Rex Holman ¶ 2.

2. Each spring, Red Rock organizes an off-road event in and around Moab, Utah, known as the Easter Jeep Safari (Safari). *Id.* ¶ 3. Red Rock has been organizing the Safari since 1983.  *Id.* The Safari draws thousands of participants from across the country every year.  The Safari spans a week and consists of dozens of trail rides on BLM land, departing from Moab. Participates drive their own four-wheel drive vehicles on the trails. *Id.* ¶ 4.

3. The trails are rated for difficulty: some trails are essentially flat, while others require the driver to navigate difficult, naturally occurring, obstacles. *Id.* The difficulty rating for each trail is published online and in Red Rock's print publication. *Id.*; *see also* Ex. 2.

4. Red Rock organizes the trail rides by signing up participants and providing trail guides for the rides. Ex. 1, ¶ 4. The trail guides drive their own vehicles and are unpaid volunteers. *Id.* Four-to-five Red Rock trial guides are assigned per trail ride, with a guide leading at the front, two guides in the middle of the group, and a trail guide bringing up the rear. *Id.*

5. The role of the trail leader is to show the participants where the trail goes. Ex. 1, ¶ 4. Guides will sometimes give guidance to drivers on how to navigate an obstacle, but *only* when asked to do so:

> "The role of the trail leader or any of the leaders is to provide help or advice only if asked to do so. If there is kind of a -- I don't know how to put it, but a driver or a Jeep driver or any kind of driver that's in that kind of a situation, they want to know whether or not they can do that particular obstacle or that particular action without having somebody help them, because it's kind of a -- a source of pride. In other words, if I go up over a big, big rock, and I don't need help doing it, and I'm – you know, it's just a lot better for me because, you know, look what I just did. I just got over this big rock, and I didn't need any help. I didn't need guidance. So it's -- it's with -- with the group of four people that were trail leaders on this trail, we have worked so much together and done so many trails together that we -- we agree that if a driver does not want help, we're not going to provide that help. If a driver asks for help, then we will provide that help."

*See* Ex 3, Don Campbell Depo. Tr. p. 21:16-22:21; Ex. 1 ¶ 7.

6. The beauty of the area and the challenging terrain are what brings so many participants of the Safari every year. Ex. 1, ¶ 6. Many drivers will challenge themselves and their equipment to the limits of their abilities. *Id.* Navigating obstacles can leave little room for error. *Id.* Drivers frequently must hit the throttle to get over an obstacle. *Id.* This is referred to as the "Moab

bump." Tires are often spinning and vehicles are at risk of rolling. *Id.* Vehicles roll on occasion. The risk is part of the thrill of the experience. *Id.*

7. While drivers are navigating an obstacle, often other participants exit their vehicles to watch. They take pictures and videos and offer advice or assistance to the driver as needed. *Id.* at ¶ 8. This is part of the fun, and why the Safari is so popular. *Id.* These trails are on public land and drivers can always use these trails, on their own, when they want to. One reason they come for the Safari is because participants enjoy communing with each other on the trail, cheering each other on, helping and learning from each other. *Id.*

### The April 14, 2019 Incident

8. In April 2019, the Plaintiff Laura Neumann and her boyfriend (now husband) Rick Weight, traveled from Nevada to Moab to participate in the Safari. Mr. Weight and Ms. Neumann registered to drive the Golden Spike Trail on April 14, 2019. A difficulty rating of seven is described as follows:

 **7:** Trail consists of rock, sand and considerable slickrock with many steps exceeding 48". Steep inclines and declines are prevalent. **Enhanced off road equipment is required including locking devices (front & rear), 35" tires, maximum vehicle ground clearance, and tow hooks.** A winch is desirable. Excellent driving skills are required. Vehicle mechanical or body damage is likely. Roll over possibilities exist.

*See* Ex. 2.

9. The Golden Spike trail is approximately 14 miles long. It is on BLM land. It has no traffic controls or signs and is uncontrolled. Ex. 1, ¶ 5. Participants can maneuver the trail in the way that they choose. *Id.* Participants navigate their off-road vehicles up and down steep rock faces and over boulders. *Id.*; *see also* YouTube video documenting participants on the Golden Spike Trail during the 2019 Safari. https://www.youtube.com/watch?v=NUJguHIqXyQ

10. On the morning of April 14, 2019, Mr. Weight drove his Jeep Rubicon to the trail head. Ms. Neumann rode as a passenger. Eight hours after they began driving the trail, Ms. Neumann and Mr. Weight were outside of their vehicle, watching another jeep navigate a difficult obstacle. That jeep was being driven by nonparty Jeremy Felts. Ms. Neumann was standing with other participants approximately 50-60 feet away from the jeep that was navigating the obstacle. *See* Ex. 4, Neumann Depo. Tr. p. 99:21-100:2; 106:21-23; 118:16-21; Ex. 5, Weight Depo. Tr. p. 52:11-54:2.

11. Mr. Felts lost control of his jeep and ran over Ms. Neumann. In a written statement to the police, Mr. Weight described the incident as follows:

> "Sunday, 4-14-19, approximately 4:30. Moab Jeep Safari. Golden Spike Trail. Laura Neumann and I, along with other spectators, were watching a white four-door Jeep climb on an obstacle, standing approximately 50 feet away. We felt safe as the driver was moving from our right to left. Spotter had driver on the right line. And as the Jeep climbed it, he began to lose traction. The driver panic revved the engine. Jeep started to tip onto the driver's side, caught traction, launched off the obstacle. Made a complete 180-degree turn directly towards the crowd. Driver cranked the wheels completely to the left, did not let off the throttle, never touched the brake. Everyone got out of the way except Laura. Laura was hit, pulled under the Jeep, chewed up like a rag doll, and spit out the back as the Jeep launched off embankment crashing into a rock wall."

*See* Ex. 5, Weight Depo, p. 52:24-54:4; Ex. 6, Weight witness statement.

12. The incident was captured on video by another participant. *See* Ex. 7, RR4W00382_Golden Spike SAR Driver.mp4; *see also* second video of incident, Exhibit 8. At approximately minute 6 of the video, Jeremy Felts (driving a white Jeep Rubicon) begins to navigate the obstacle. A trail guide with Red Rock (wearing a long sleeve green shirt) is seen giving guidance to Mr. Felts before he loses control of the vehicle. *Id.*

13. Ms. Neumann alleges that Red Rock was negligent by failing to maintain a safe distance for the participants observing the other drivers. Ms. Neumann also alleges that Defendant

improperly advised Jeremy Felts attempting an obstacle, resulting in him losing control of his vehicle and striking Ms. Neumann. *See* Complaint ¶ ¶ 9, 12.

**Release of Liability and Waiver of Claims**

14. Before embarking on the trial ride, Ms. Neumann signed a Release of Liability and Waiver of Claims ("Waiver").  *See* Waiver, attached as Ex. 9. Ms. Neumann signed the Waiver on April 14, 2019. *Id.*; *see also* Ex. 4, Neumann Depo. p. 184:18-23.

15. The Waiver is two-sided. The front side of the Waiver has the following heading:

> **EXPRESS ASSUMPTION OF RISK, DECLARATION OF FITNESS,**
> **RELEASE OF LIABILITY, WAIVER OF CLAIMS, AND INDEMNITY AGREEMENT**
> **RED ROCK 4-WHEELERS, INC.**
>
> *Please read and be certain you understand the implications of signing this important document.*
> EXPRESS ASSUMPTION OF RISK ASSOCIATED WITH RED ROCK 4-WHEELER ("RR4W") EVENTS:

*See* Ex. 9.

16. The Waiver then outlines multiple inherent hazards and risks in the event, including:

> i.    Risk of injury from the Activities and equipment utilized in the Activities can be significant and includes the potential for cuts, broken bones, permanent disability, and death.
> ii.   Possible equipment failure and/or malfunction of my own or others' equipment.
> iii.  Collision and running into objects, persons or animals including but not limited to fallen people or objects, boulders, crevices, logs and stumps, sand-traps and other hazards that are not visible.
> iv.   My own negligence and/or the negligence of others, including RR4W directors, officers, members, employees, trail officials, volunteers, and agents, including but not limited to operator error.
> v.    Falling off cliffs, large rocks or boulders; sliding on or becoming stuck in sand; flipping my motor vehicle or other hazards that may result in wetness, injury, exposure to elements, hypothermia, impact of body upon water, rocks, roadways, or sand.
> vi.   Cold weather and heat related injuries and illness including but not limited to frostnip, frost bite, heat exhaustion, heat stroke, sunburn, hypothermia, dehydration.
> vii.  Exposure to outdoor elements, including but not limited to rock fall, inclement weather, thunder and lightning, severe and/or varied wind, temperature or weather conditions.
> viii. Attack by or encounter with insects, reptiles, and/or animals.
> ix.   Accidents or illness occurring in remote places where there are no available medical facilities.
> x.    Fatigue, chill, and/or dizziness, which may diminish my/our reaction time and increase the risk of accident.
>
> **I understand this description of hazards/risks is not complete and that unknown or unanticipated hazards/ risks may result in injury, illness, disability, or death.**

*Id.*

17. The back side of the Waiver has the following heading:

**RELEASE OF LIABILITY, WAIVER OF CLAIMS, AND INDEMNITY AGREEEMENT:**

In consideration for being permitted to participate in 4-wheeling, motorized touring, 4-wheel drive events, outdoor recreational activities, traveling to and from the 4-wheel trails and related activities.

1. <u>Release of Liability.</u> I HEREBY RELEASE WITH RESPECT TO ANY AND ALL INJURY, ILLNESS, DISABILITY, DEATH, or loss or damage to person or property arising out of my participation in or otherwise related to the Activities, WHETHER CAUSED BY NEGLIGENCE (Active or Passive) OR OTHERWISE, Red Rock 4-Wheelers, Inc., and its officers, directors, employees, agents, trail officials and volunteers and its sponsors, including the Chamber of Commerce, Grand County, and the Old Spanish Trail Arena (collectively referred to herein as "Releasees").

2. <u>Waiver of Claims.</u> I knowingly, voluntarily, express waive any claim I may have against Releasees for any injuries or damages that I may sustain as a result of participation of the Activities. I, my estate, heirs, survivors, executors, or assigns forever release, waive, discharge and covenant not to sue Releasees for any injury or death caused by negligence or other acts.

3. <u>Indemnification.</u> I agree to indemnify, hold harmless, and defend Releasees from any and all claims, damages, actions, judgments, liabilities, demands, agreements, costs and controversies of any kind, in law, equity or otherwise, whether known or unknown, arising out of my participation in the Activities, whether causes by the negligence (active or passive) of the Releasees or otherwise. . . .

*See* Ex. 9.

**ARGUMENT**

I.    **Summary Judgment Standard.**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of showing an absence of evidence to support the non-moving party's case. *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022). The non-moving party must then "identify specific facts that show the existence of a genuine issue

of material fact", and "must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Id.* (quoting *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995)).

"For there to be a 'genuine' dispute of fact, 'there must be more than a mere scintilla of evidence,' and summary judgment is properly granted "if the evidence is merely colorable or is not significantly probative." *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020) (quoting *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993)).

## II.    Ms. Neumann's Claims Are Barred Because She Assumed the Risk of Being Injured by Other Drivers.

"The determination of whether a legal duty exists ... is a purely legal question that requires an examination of the legal relationships between the parties." *Herland v. Izatt,* 2015 UT 30, ¶ 9 (quotation omitted).

Utah has adopted section 324 of the *Restatement (Second) of Torts* which states: *"*The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." *Id.*  This rule "is applicable irrespective of the gravity of the danger to which the other is subjected and the insignificance of the trouble, effort, or expense of giving him aid or protection." *Id.* at ¶ 12.  Thus, the general rule in Utah is that "a party does not ordinarily have an affirmative duty to care for another." *Id.* at ¶ 9. "Action may be necessary where there is an affirmative duty to aid or protect the endangered individual." *Id.* at ¶ 13.  Utah courts consider five factors to determine whether there is an affirmative duty to protect an individual:

> (1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or

likelihood of injury; (4) public policy as to which party can best bear the loss occasioned by the injury; and (5) other general policy considerations.

*Id.*

In *Nixon v. Clay*, the Utah Supreme Court recognized the "doctrine of primary assumption of risk, which establishes that a defendant has no duty to avoid dangers that are 'inherent' in a given activity." *Nixon v. Clay,* 2019 UT 32, ¶ 15 (citing *Rutherford v. Talisker*, 2019 UT 27, ¶¶ 45–46 ((describing the doctrine of primary assumption of risk and explaining that it forecloses a duty in tort for conduct inherent in a voluntary activity)).

The "inherency" of the danger is "rooted in a principle of implied consent—that participants implicitly consent to dangers that are inherent in the activity they voluntarily participate in." *Id.* "For [inherent] dangers, the doctrine of primary assumption of risk provides that there is no duty, and thus no liability, in tort. The inherency inquiry will depend on the facts of a particular case and the characteristics of a particular [activity]." *Id.* at ¶¶ 26-27.

An activity falls within the primary assumption of risk doctrine if it "is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." *Huff v. Wilkins*,138 Cal. App. 4th 732, 739 (2006), as modified (Apr. 26, 2006)(quotations omitted). "The overriding consideration in the application of primary assumption of risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature." *Peart v. Ferro*, 119 Cal. App. 4th 60, 71 (Cal. App. 2004); *see also Distefano v. Forester*, 85 Cal. App. 4th 1249, (holding that the doctrine of primary assumption of risk precludes claim for injuries which are inherent in the risks of off-roading driving activities, and finding that "the very nature of the sport of off-roading is driving activity that would not be countenanced on streets and highways, such as unsafe speeds,

stirring up dust, becoming airborne on hills and cresting dunes…[and] that there is an inherent risk of injury, serious injury or even death, in the conduct of the sport."); *Tallarigo v. Dryden*, 2013 WL 6629036, *4 (Ohio App. 2013) (claim for injury for dirt bike riding barred because off-roading involves inherent risks of inadvertent motor vehicle collisions); *Schiavone v. Brinewood Rod & Gun Club, Inc.*, 283 A.D.2d 234 (N.Y. 2001) (claims brought by club member injured while dirt-biking on land owned by non-profit recreational club barred by assumption of risk).

Off-road jeeping involves an elevated degree of danger. The terrain, skill and experience of the driver play a significant role in the enjoyment of the sport. The thrill of attempting (and conquering) a difficult obstacle is what draws enthusiast to the Safari every year. Being struck by another driver is a risk that is inherent in attending the Safari. Each trail ride has approximately 30 participating drivers. The risk of another driver making a mistake and colliding with another vehicle or person, is an inherent risk of this activity. Certainly, participants are free to choose easier trails which are less dangerous. They can also also choose to stay in their vehicles, or if they exit, stand far away from other vehicles. Alternatively, they can choose to exit their vehicles to watch a driver navigate a challenging obstacle, standing close by for the best view and photo opportunity. The choice is theirs.

Ms. Neumann chose to participate in the Safari. She chose to exit her vehicle and watch while Mr. Felts navigated an obstacle. No one from Red Rock directed her to stand there. By standing there, she assumed the risk that if Mr. Felts made a mistake, she could be struck by his vehicle. Ms. Neumann's claims are therefore barred by the primary assumption of risk.

**III.    Ms. Neumann's Claims Are Barred by the Waiver.[1]**

"It is a general principle of common law that those who are not engaged in public service may properly bargain against liability for harm caused by their ordinary negligence in performance of contractual duty." *Pearce v. Utah Athletic Found.*, 179 P.3d 760, 765 (Utah 2008) (abrogated on other grounds by *Penunuri v. Sundance Partners Ltd.*, 423 P.3d 1150 (Utah 2017). Preinjury releases are not unlimited in power and can be invalidated when: (1) the release offends public policy; (2) the release is for activities that fit within the public interest exception; and (3) the release is unclear or ambiguous. *Id.* at p. 765.

Here, the Waiver was clear and unequivocal. It was not against public policy, and because it was signed for participation in a voluntary activity, it does not fall under the public interest exception.

**A.  The Waiver Language is Clear and Unambiguous.**

When interpreting a contract, the court should "examine the plain language of a contract to determine meaning and intent," and enforce that clear meaning between the parties. *Meadow Valley Contractors, Inc. v. State Dept. of Transp.*, 266 P.3d 671, 678 (Utah 2011). Whether

---

[1] A federal court sitting in diversity looks to the conflict of law rules of the forum state to determine the controlling substantive law. *See Mountain Fuel Supply v. Reliance Ins. Co.*, 933 F.2d 882, 887 (10th Cir. 1991). Utah courts "apply the most significant relationship approached as described in the Restatement (Second) of Conflict of Laws in determining which state's laws should apply to a given circumstance." *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 14. Under that test, the "rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties". *Volonte v. Domo, Inc.*, 2023 UT App 25, ¶ 75. Here, the Waiver was drafted by Red Rock, a Utah Corporation.  It was signed by Ms. Neumann when she was in Utah. And Ms. Neumann's claims arose in Utah.  Utah has the most signification relationship to the Waiver and Utah law applies to its interpretation.

language in a release is clear and unequivocal is a question of law.  *Interwest Construction v. Palmer,* 923 P.2d 1350, 1358-1359 (Utah 1996).

While the language used must "clearly and unequivocally express an intent to limit tort liability in the contract itself" no magic words are required for such a release to be enforceable. *Interwest Cost.*, 923 P.2d at 1356.  To be effective, "a release need not achieve perfection…It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence." *Pearce*, 179 P.3d at 767.  Utah's rule for enforcing release, indemnity, and exculpatory agreements is articulated as follows:

> [T]o constitute a clear and unequivocal expression of intent to indemnify for a party's own negligence, an indemnity agreement need not contain specific language to that effect; rather, the language and purpose of the entire agreement, together with the surrounding facts and circumstances, may provide a sufficiently clear and unequivocal expression of the parties' intent.

*Healey v. J.B. Sheet Metal, Inc.*, 892 P.2d 1047, 1049 (Utah App. 1985) (emphasis added) (*citing Freund v. Utah Power & Light Co.*, 793 P.2d 362 (Utah 1990)).

In *Russ v. Woodside Homes, Inc.* 905 P.2d 901 (Utah Ct. App. 1995), the Utah Court of Appeals considered whether a similar hold harmless provision in a construction contract between a contractor and homeowners, Mr. and Mrs. Russ, was enforceable.  The contract contained the following language:

> The construction site is a dangerous place to visit. Buyer agrees to exercise extreme caution if Buyer chooses to visit the site, to limit the number of such visits, and to refrain from allowing Buyer's or other children to accompany Buyer on such visits. Buyer, to the fullest extent permitted by law, agrees to hold harmless Woodside (including its affiliates and subsidiaries and other contractors and subcontractors and their agents and employees) from any and all claims, damages, loss and expenses, including but not limited to attorney's fees, arising out of any death, accident, injury,  or other occurrence resulting from visits to the job site by Buyer or Buyer's family or other guests.

13

*Id.* at 903.  Mrs. Russ died after falling into a hole at the construction site, and Mr. Russ subsequently filed a lawsuit against the contractor Woodside Homes.  *Id.* Woodside moved for summary judgment on the basis of the contract's hold harmless provision.  *Id.*

As explained in *Russ*, under Utah law "parties may contract to avoid a party's potential liability before injuries have occurred. Often described as exculpatory clauses, such provisions relieve one party from the risk of loss or injury in a particular transaction or occurrence and deprive the other party of the right to recover damages for loss or injury. Such exculpatory or hold harmless provisions may release parties from liability for their ordinary negligence." *Id.* at 905.

In determining whether the contract's language was "clear and unequivocal", the *Russ* Court explained that while "[h]istorically, Utah courts applied a strict construction rule for indemnity provisions . . . the Utah Supreme Court has relaxed the rule of strict construction and adopted a more lenient clear and unequivocal test for enforcing indemnity agreements." *Id.* at 905.

The *Russ* Court stated: "Utah courts thus apply the same test to contracts that release, shift or avoid potential liability for negligence.  When the intent to relieve the party from liability for alleged negligence is clearly and unequivocally expressed in a contractual provision, we will enforce that provision." *Id.*  "In other words, 'it is not necessary that the exculpatory language refers expressly to the negligence of the indemnitee so long as the intention to indemnify can be clearly implied from the language and purpose of the entire agreement.'" *Russ,* at 905 (quoting *Freund v. Utah Power & Light Co.*, 793 P.2d 362, 370 (Utah 1990) (additional quotations and citations omitted) (emphasis added).  And, "[a]lthough this rule has developed in the context of indemnity agreements, it applies with equal force to releases and exculpatory or hold harmless agreements." *Id.*

In *Russ*, the plaintiff argued that because the hold harmless agreement did not include the word "negligence", the provision was not sufficiently clear to bar his negligence claim. The *Russ* Court disagreed, stating that "the word 'negligence' is not a talisman to enforce contracts avoiding potential liability. A hold harmless provision is enforceable when 'the broad sweep of the language employed by the parties clearly covers those instances in which [a party] may be negligent." *Id.* (quoting *Freund*, 793 P.2d at 371). The *Russ* Court then analyzed the hold harmless language, and noted that it holds Woodside harmless for "any and all claims, damages, losses and expenses." It also holds Woodside harmless "to the fullest extent permitted by law" and it holds Woodside harmless for "any death, accident, injury, or other occurrence resulting from visits to the job site." The court held that the "broad sweep" of the "language clearly and unequivocally establishes the parties' intent to avoid Woodside's potential liability arising from the Russes' loss or injury incurred during job site visits. Thus, the instant hold harmless provision meets the test of enforceability and bars Russ's negligence action." *Id.* at 906.

Here, the language of the Waiver signed by Ms. Neumann is clear and unambiguous. The Waiver states:

"In consideration for being permitted to participate in 4-wheeling, motorized touring, 4-wheel drive events, outdoor recreational activities, traveling to and from the 4-wheel trails, and related activities:

1. <u>Release of liability</u>: I HEREBY RELEASE WITH RESPECT TO ANY OR ALL INJURY, ILLNESS, DISABILITY, DEATH, or loss or damage to person or property arising out of my participation in or otherwise related to the Activities, WHETHER CAUSED BY NEGLIGENCE (Active or Passive) OR OTHERWISE, Red Rock 4-Wheelers, Inc, and its officers, directors, employees, agents, trail officials, and volunteers… "Releasees").

2. <u>Waiver of Claims</u>: I knowingly, voluntarily, and expressly waive any claim I may have against Releasees for any injuries or damages that I may sustain as a result of participation of the Activities, I, my estate, heirs, executors, or assigns forever release,

waive, discharge and covenant not to sue Releasees for any injury or death caused by negligence or other acts.

3. <u>Indemnification.</u> I agree to indemnify, hold harmless, and defend Release from any and all claims, damages, actions, judgments, liabilities, demands, agreements, costs and controversies of any kind, in law, equity or otherwise, whether known or unknown, arising out of my participation in the Activities, whether caused by the negligence (active or passive) of the Releasees or otherwise."

*See* Ex. 9.

The Waiver clearly and unmistakably releases alleged negligent acts committed by Red Rock during 4-wheel drive events. The language from the Waiver is also clear that the release of liability was in regard to participation in 4-wheel driving activities, including 4-wheel drive events. Defendant specifically articulates negligence three times. There is no additional language in the Waiver regarding exceptions to Red Rock and 4-wheel drive events, there is not a possibility that reasonable minds would differ on who and what the Plaintiff released when she signed the preinjury release. This language is clear and unequivocal, and meets the standard for a valid preinjury release.

Therefore, because the preinjury release is clear and unmistakable, the court should grant the motion for summary judgment to dismiss the claim of ordinary negligence against the Defendant.

**B.  The Waiver Does Not Violate Public Policy.**

There is no public policy, either in statute or in case law, which prohibits an adult from releasing claims of liability for injuries sustained while attending a jeep club event.  For "a contract to be void on the basis of public policy, there must be a showing free from doubt that the contract is against public policy." *Penunuri v. Sundance Partners, Ltd.*, ¶ 15, 257 P.3d 1049, 1053 (Utah

16

Ct. App. June 9, 2011) (citations omitted). In *Penenuri*, the Utah Supreme Court held that the waiver signed for recreational horseback riding was not void against public policy. Utah courts are reluctant to invalidate a release on policy grounds unless there is a clearly stated policy in statute, or a clear policy has been articulated in prior case law. *Rothstein v. Snowbird Corp.,* 2007 UT 96, ¶ 10, 175 P.3d 560.

There is no public policy in this case against adult from releasing liability for injuries sustained in a voluntary jeep club activity. There is no policy in case law that would prevent such a release. In fact, Utah courts typically uphold such releases. See, e.g., *Pearce*, 2008 UT 13 (holding that a release signed by a passenger in a bobsled ride was valid); *Berry*, 2007 UT 87 (holding that a release for a competitor in a ski race was valid). There is also no statute that articulates a policy against releases for jeep rides and operation. Because there is no clearly articulated policy, the Court should find that the Waiver does not violate public policy.

### C. The Contract Does Not Violate the Public Interest Exception.

Finally, the Waiver is valid because jeep clubs and driving jeeps is not the type of activity that falls within the public interest exception. The public interest exception is based on the policy against contractually limiting liability "for activities in which there is a strong public interest." *Berry*, 2007 UT 87, ¶12. Although different courts look at various factors to determine whether an activity falls within the public interest, the Utah Supreme Court adopted six factors, based on the California case of *Tunkl v. Regents of the Univ. of Cal.*, 383 P.2d 441, 445-46 (Cal. 1963), to weigh against application of the public interest exception. The six factors include:

(1) The transaction concerns a business of a type generally thought suitable for public regulation.

(2) the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

(3) The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

(4) As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

(5) In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

(6) Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Berry*, 2007 UT 87, ¶ 15.

No one of the above factors is dispositive, and the existence of any of the factors alone is not enough to bring an activity within the public interest, or keep it out of the public interest. Here, several of the factors point away from the Safari being included under the public interest exception. For example, jeep clubs are not performing a service of great importance to the public, which is often a matter of practical necessity. Moreover, jeep clubs are a non-essential activity so the fourth and fifth factors don't apply because Red Rock's advantage in bargaining power was of little consequence since Plaintiff did not have to attend jeep club event or ride in a jeep. *See Berry*, 2007 UT 87, ¶¶ 21-22. In *Berry*, the fact that the activity for which the release was signed was non-essential weighed heavily in the decision to uphold the release, even though the releasee had considerably greater bargaining power, and presented its customer with a standard adhesion contract.

The *Tunkl* factors demonstrate that jeep clubs and jeeping is not a public interest activity. Jeeping and jeeps are the type of non-essential activity that should not be included in the public interest. Therefore, this Court should find that the Waiver is valid, and bar Plaintiff's claims.

**IV.    Plaintiff Cannot Meet Her Burden of Proving that Red Rock Was Grossly Negligent.**

Gross negligence is "the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result." *Berry*, 2007 UT 87, P 26. "Gross negligence requires proof of conduct substantially more distant from the appropriate standard of care than ordinary negligence." *Id.* The Utah Supreme Court has affirmed summary judgment on a gross negligence claim where "it cannot be reasonably asserted that [the defendant] showed utter indifference to the possibility that [its acts could cause the claimed damages]." *Blaisdell v. Dentrix Dental Sys., Inc*., 2012 UT 37, ¶ 14, 284 P.3d 616.

Discovery has uncovered no evidence demonstrating a gross breach of the standard of care. Plaintiff has been unable to demonstrate that Defendant did anything more than simply organize an off-road event where the accident occurred. Defendant did not direct the Plaintiff to stand in that location.  Moreover, Defendant had no control over the actions of Jeremy Felts who ran over Plaintiff.

Plaintiff has no evidence to show that Red Rock showed utter indifference to her safety. Red Rock did not instruct the Plaintiff to stand in that location.  The accident was completely unexpected to Red Rock and the more than dozen participants standing in that location.

<u>**CONCLUSION**</u>

For each of the foregoing reasons, Defendant respectfully requests that its Motion for Summary Judgment be granted, and this case be dismissed with prejudice.

DATED this 13th day of December 2024.

STRONG & HANNI

*/s/ Karmen Schmid*

By _____

Karmen Schmid
Spencer D. Brown
*Attorneys for Defendant*
*Red Rock 4-Wheelers, Inc.*

20

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of December 2024, I caused to be served the foregoing

document upon the parties of record in this proceeding set forth below by **electronic filing**:

Matthew L. Johnson
JOHNSON & GUBLER
8831 W Sahara Ave.
Las Vegas, NV 89117
mjohnson@mjohnsonlaw.com

David J. Feldman
THE FELDMAN FIRM, P.C.
8831 West Sahara Ave.
Las Vegas, NV 89117
dfeldman@feldmangraf.com
*Attorneys for Plaintiff*

/s/ Lauren E. Peterson
_____

5094.0032